Sam LINDSEY, Plaintiff,

v.

**METROPOLITAN LIFE INSURANCE COMPANY, a New York corporation, Defendant.**

No. 95–CV–037J.

United States District Court,
D. Wyoming.

Nov. 8, 1995.

William M. McKellar, Boley & McKellar, Cheyenne, WY, Glenn E. Smith, Glenn E. Smith & Associates, Cheyenne, WY, for Sam Lindsey.

Bradley T. Cave, Edward E. Risha, Holland & Hart, Cheyenne, WY, Michael S. Beaver, Jimmy Goh, Holland & Hart, Denver, CO, for Metropolitan Life Insurance Company, a New York corporation.

### ORDER ON MOTIONS FOR SUMMARY JUDGMENT

ALAN B. JOHNSON, Chief Judge.

The plaintiff's Motion for Summary Judgment and the defendant's Motion for Summary Judgment came before the Court for consideration, having been submitted to the Court upon briefs of the parties. The Court, having considered the parties' motions, the memoranda filed in support of the motions as well as all supporting materials offered by the parties, and being fully advised in the premises, FINDS and ORDERS as follows:

#### Background

Plaintiff claims he is entitled to receive long term disability benefits pursuant to the qualified employee welfare benefit plan established by his former employer, XL/Datacomp, Inc., under the Employee Retirement Income Security Act of 1974 ("ERISA"). The plan at issue was insured through defendant Metropolitan Life Insurance Company ("MetLife"). The plan purchased disability benefits from MetLife as the method of providing the benefits promised under the Plan.

MetLife is both the insurer and fiduciary under the plan.

From January 1990 until January 1995, plaintiff was employed by XL/Datacomp, Inc. Throughout the period of his employment with XL/Datacomp, plaintiff was enrolled in the plan as a participant. Consequently, plaintiff was insured for, and was eligible to receive, long term disability benefits from the plan in the event he became disabled to work. Plaintiff asserts that what is required to establish total disability under the plan is proof that (a) the plan participant suffered a 50% loss of earnings capacity because of an injury or sickness and (b) that he, as the plan participant, has required the regular care and attendance of a doctor.

When MetLife receives proof that a plan participant is Totally Disabled, the plan requires MetLife to pay, beginning 180 days after the onset of total disability, a monthly benefit in accordance with the Schedule of Benefits set forth in the plan. That benefit is the lesser of $10,000 per month or 60% of the basic monthly earnings. Plaintiff earned $151,000 in commissions in the 12 months preceding his disability, or $12,583.33 per month. Sixty percent of that monthly sum is $7,550. Since that sum is less than $10,000 per month, plaintiff contends that he is entitled to receive $7,550 per month, from January 27, 1994, and continuing for as long as he remains totally disabled or until age 65, whichever first occurs. *See also* METLIND at 00015. [Both plaintiff and defendant have included portions of the MetLife claim file as exhibits in support of their motions for summary judgment. For convenience, in this Order the Court will refer to exhibits or materials contained in the claim file, whether offered by defendant or plaintiff, as MET-LIND at ——.]

Beginning in 1991, and while employed by XL/Datacomp and while a participant in the plan, plaintiff began to experience serious ongoing medical problems which required extensive medical and surgical treatment, including removal of a kidney and various other treatments. As a result, plaintiff was disabled from January 1991 through Decem-

ber of 1991. In December of 1991, plaintiff was able to return to work and asserts that he was able to function normally for the next year and one-half. However, in August of 1993, plaintiff required further surgery to remove an infected epididymis, and following that surgery, he developed many symptoms, including claims of chronic low grade fevers, right groin pain, low back pain radiating down both legs, numbness of the right hand and arm with weakness of the grip, a tendency to fall a lot, fatigue and the need to sleep at least fourteen hours a day, poor eyesight, poor memory, constant headaches, digestive gas, the need to get up at least five time a night to urinate, high blood pressure, dizziness, hay fever, sinus congestion, tinnitus, and depression.[1] As a result, plaintiff was not able to work from July 30, 1993 through June of 1994. At that time, his employer, XL/Datacomp, restructured plaintiff's job by limiting the amount of territory for which plaintiff was responsible and reducing the numbers of work hours to 20 hours per week. Plaintiff asserts that although he attempted to work on a part-time basis, he was prevented from doing so by his pain and fatigue. As a result, he was placed on unpaid leave in September of 1994, and his employment with XL/Datacomp was terminated in January, 1995 because he was not able to perform the duties of his job.

In February of 1994, plaintiff filed a claim for disability benefits with MetLife. For purposes of his claim, plaintiff was considered to be "off work" since July 30, 1993. Accordingly, his effective date for the purposes of receiving disability benefits was established as January 27, 1994, because of a plan provision that precludes the payment of benefits during the first 180 days of disability. METLIND at 00479.

Plaintiff asserts that, although he has been examined and treated by a number of physicians, no one has been able to diagnose satisfactorily all of his medical problems. He has been diagnosed at various times with epididymitis, prostatitis, seminal vesiculitis, and a neurogenic bladder condition. Even though

---

1. These complaints are listed in a letter dated July 10, 1994 from Allen Berger, D.C. to Dan

Perlman, M.D. METLIND at 149–150.

a diagnosis has not been confirmed, plaintiff continues to experience difficulties with persistent pain and chronic fatigue. Because treatment of pain and fatigue has not been successful, he has not worked on a full time basis since July 1993. He filed his claim for disability benefits in February of 1994 through the XL/Datacomp disability plan.

The claim was received by MetLife February 10, 1994. The medical records of plaintiff's primary care physician, Dr. Gordon Ehlers, were included in the materials submitted with his claim. In March of 1994, Shirley Darvasi, the Senior Claims examiner for MetLife responsible for handling plaintiff's claim, requested information from Dr. Ehlers, Dr. David Cox, and Dr. Robert Cox. During this period of time, MetLife obtained plaintiff's medical records and then sent the medical records to its paid medical consultant, Julian Freeman, for review on April 14, 1994.

After examining the medical records, Dr. Freeman concluded and prepared a report that plaintiff had the "functional capacity" to return to work, by report dated April 29, 1994. Freeman expressed his opinions in several letters written by him to MetLife. Plaintiff asserts that Dr. Freeman's reports did not include any determination whether plaintiff was totally disabled within the meaning of the language of the plan, i.e., whether plaintiff suffered a 50% loss of earnings capacity, and that he failed to identify the "material duties" of plaintiff's job and whether plaintiff could perform such duties.

On the basis of Dr. Freeman's determination that plaintiff had the "functional capacity" to return to work, MetLife denied plaintiff's claim for benefits by letter dated May 25, 1994. The entire text of that letter reads as follows:

Dear Mr. Lindsey:

We have completed our evaluation of your claim to determine your eligibility for Long Term Disability benefits.

The policy states:

**Total Disability or Totally Disabled** means that due to an Injury or Sickness, you:

1. are completely and continuously unable to perform each of the material duties or your regular job; and

2. require the regular care and attendance of a Doctor.

You will also be considered Totally Disabled when, due to an Injury or Sickness, you suffer a 50% loss of earnings capacity and require the regular care and attendance of a Doctor.

In addition, you must first satisfy an Elimination Period of 180 days of Total Disability.

You stated that your treating physicians were Drs. Robert Cox, David Cox, and Gordon Ehlers, so we requested records from these doctors.

Dr. Robert Cox stated that you were released and he never prohibited work. Dr. David Cox stated that he released you to return to work on September 9, 1993. However, Dr. Ehlers stated that your disability continued. Therefore, we sent your medical records, including the most recent letter from Dr. Ehlers, for review by an Independent Medical Consultant. These records were reviewed by three Board Certified physicians who conclude that the findings do not support disability. Although you have some problems, the Consultants' report indicates that you should be able to perform your occupation.

Based on the above, you are not eligible for Long Term Disability benefits.

We want you to understand that our decision in this matter has been based solely upon information contained in our file. As such, we are willing to answer any questions or to review any further objective medical evidence you would care to submit which may have an effect upon consideration given to this claim.

Metropolitan reserves all of its rights or defenses either expressly stated or implied.

You may request a review of the claim **within *60* days of the denial date** by writing directly to Group Insurance Claims Review, Metropolitan Life Insurance Company, at the address indicated in this letter. You should include the information contained in the Claim Identification shown above. When requesting this review, you should state the reason you believe the claim was improperly denied and you may submit any data, questions or comments to Metropolitan you deem ap-

propriate. Metropolitan will reevaluate all the data and you will be informed in a timely manner of our findings.

Should you have any questions, please call me.

METLIND at 00378–00379.

On July 20, 1994, through his counsel, plaintiff submitted a request for review of that denial. METLIND at 00098–00105. With that letter a number of various letters from doctors that had treated plaintiff were enclosed, including follow-up letters from Dr. Robert Cox, Dr. Gordon Ehlers, Dr. Daniel M. Perlman, Allen Berger, D.C., as well as Mr. Lindsey's application for Social Security

Benefits, a number of letters regarding Mr. Lindsey's deteriorating health, letters from various managers and fellow employees at XL/Datacomp, customers, business associates and friends.

■ MetLife never formally responded to the request for review, although the claim file and materials before the Court clearly disclose a continuing course of correspondence and activity between plaintiff and/or his counsel and MetLife occurred thereafter. By virtue of the passage of time and by operation of law, plaintiff now asserts that the request for review was denied pursuant to 29 C.F.R. ch. XXV, § 2560.503–1.[2] Plain-

---

2. When a claim is denied, 29 U.S.C. § 1133 requires that notice of the claim denial include specific information. 29 C.F.R. § 2560.503–1(f) sets out what shall be included in the contents of such a notice:

> (f) Content of notice. A plan administrator or, if paragraph (c) of this section is applicable, the insurance company, insurance service, or other similar organization, shall provide to every claimant who is denied a claim for benefits written notice setting forth in a manner calculated to be understood by the claimant:
>> (1) The specific reason or reasons for the denial;
>> (2) Specific reference to pertinent plan provisions on which the denial is based;
>> (3) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary; and
>> (4) Appropriate information as to the steps to be taken if the participant or beneficiary wishes to submit his or her claim for review.

29 C.F.R. § 2560.503–1 continues:

> (g) Review procedure. (1) Every plan shall establish and maintain a procedure by which a claimant or his duly authorized representative has a reasonable opportunity to appeal a denied claim to an appropriate named fiduciary or to a person designated by such fiduciary, and under which a full and fair review of the claim and its denial may be obtained. Every such procedure shall include but not be limited to provisions that a claimant or his duly authorized representative may:
>> (i) Request a review upon written application to the plan;
>> (ii) Review pertinent documents; and
>> (iii) Submit issues and comments in writing.
> (2) To the extent that benefits under an employee benefit plan are provided or administered by an insurance company, insurance service, or other similar organization which is subject to regulation under the insurance laws of one or more States, the claims procedure pertaining to such benefits may provide for

review of and decision upon denied claims by such company, service or organization. In such case, that company, service, or organization shall be the "appropriate named fiduciary" for purposes of this section. In all other cases, the "appropriate named fiduciary" for purposes of this section may be the plan administrator or any other person designated by the plan, provided that such plan administrator or other person is either named in the plan instrument or is identified pursuant to a procedure set forth in the plan as the person who reviews and makes decisions on claim denials.

> (3) A plan may establish a limited period within which a claimant must file any request for review of a denied claim. Such time limits must be reasonable and related to the nature of the benefit which is the subject of the claim and to other attendant circumstances. In no event may such a period expire less than 60 days after receipt by the claimant of written notification of denial of a claim.

> (h) Decision on review. (1)(i) A decision by an appropriate named fiduciary shall be made promptly, and shall not ordinarily be made later than 60 days after the plan's receipt of a request for review, unless special circumstances (such as the need to hold a hearing, if the plan procedure provides for a hearing) require an extension of time for processing, in which case a decision shall be rendered as soon as possible, but not later than 120 days after receipt of a request for review.

> \* \* \* \* \* \*

In this case, defendant's notice of the claim denial did not strictly comply with the federal regulations. However, not all procedural defects will justify upsetting the fiduciary's decision and this Court will not rely on such defects in this instance for reaching its decision in the matter. The adequacy of notice is discussed in *Donato v. Metropolitan Life Ins. Co.*, 19 F.3d 375, 382 (7th Cir.1994). That court stated that substantial compliance with regulations is sufficient, and set forth the following principle to use as a guide in determining whether there has been substantial compliance: "the purpose of 29 U.S.C. § 1133

tiff subsequently filed this action against MetLife for past and future benefits. He also seeks interest and attorneys' fees.

Plaintiff claims entitlement to long term disability benefits pursuant to 29 U.S.C. § 1132(a)(1)(B) [3] which empowers a plan beneficiary, such as plaintiff, to recover benefits due under the terms of the plan and to enforce his rights under the terms of the plan. Plaintiff claims MetLife has violated the terms and provisions of the plan in the following ways:

(a) MetLife never determined what plaintiff's material job duties were and whether plaintiff was unable to perform those duties after January of 1994. Without doing so, it was impossible to determine whether plaintiff was disabled under the plan.

(b) MetLife never determined whether plaintiff suffered a 50% loss of earning capacity as a result of his sickness. Without doing so, it was impossible for MetLife to determine whether plaintiff was disabled under the plan.

Defendant MetLife has generally denied the allegations of plaintiff's complaint. MetLife specifically denies that its claim denial or any of its actions in processing the plaintiff's claim constitute violations of ERISA. MetLife has asserted various affirmative defenses in its answer to the complaint, including 1) plaintiff has failed to state claims upon which relief can be granted; 2) plaintiff breached his obligations under the plan by refusing to co-operate with MetLife in attending an independent medical examination; 3) MetLife is entitled to offset and reduce any award based on other payments and benefits; 4) plaintiff failed to exhaust administrative and plan remedies by failing to comply with the terms of the plan; 5) MetLife's decisions and determinations are supported by substantial evidence, are not arbitrary and capricious, and do not constitute error of law; 6) ERISA provides only for the recovery of benefits and no other element of damages; and 7) that the plan provides MetLife with exclusive discretionary authority to construe plan terms, and to make all claim determinations.

### Uncontroverted Facts

At the final pretrial conference that was held at an earlier date, the parties agreed that the following facts are uncontroverted, in addition to those facts each party claims to

and its implementing regulations, 29 C.F.R. § 2560.503–1(f), serves as our guide: 'was ' the beneficiary supplied with a statement of reasons that, under the circumstances of the case, permitted a sufficiently clear understanding of the administrator's position to permit effective review.' " *Donato*, 19 F.3d at 382, quoting *Halpin v. W.W. Grainger, Inc.*, 962 F.2d 685, 690 (7th Cir.1992). There is authority that finds inadequate notice of reasons for denying an ERISA claim may be, in certain circumstances, arbitrary and capricious or that procedural errors may be a significant error on a question of law requiring the decision to deny benefits to be overturned. *See e.g., VanderKlok v. Provident Life & Acc. Ins. Co.*, 956 F.2d 610, 615–616 (6th Cir.1992); *Sage v. Automation Inc. Pension Plan & Trust*, 845 F.2d 885, 895 (10th Cir.1988) (not all procedural defects will upset the decision of plan representatives); *Wolfe v. J.C. Penney Co., Inc.*, 710 F.2d 388, 392 (7th Cir.1983) (substantial compliance with regulations required); *Jader v. Principal Mut. Life. Ins. Co.*, 723 F.Supp. 1338, 1341 (D.Minn.1989); *McLean Hosp. Corp. v. Lasher*, 819 F.Supp. 110, 119 (D.Mass.1993). .

The information available to plaintiff in this case appears to have provided a sufficiently clear understanding of MctLife's decision to deny plaintiff disability benefits, although it was not technically in compliance with the requirements of the regulations. The denial letter is defective in that it really does not disclose the underlying basis of MetLife's decision in anything other than broad conclusory statements and makes only a blanket request for further information. It makes little effort to describe the nature of what additional information was needed and the reason it was necessary. *Donato*, 19 F.3d at 382. We only reach the conclusion that we do in this case as to the adequacy of the notice of claim denial because of the continuing course of correspondence between the parties, although the opposite conclusion could be reached just as easily. A claimant should not have to guess what information would be required by a fiduciary to promote effective review of claim denial. The Court does not find the dispute concerning the adequacy of notice to be dispositive in this case.

3. 29 U.S.C. § 1132, provides in relevant part:

(a) **Persons empowered to bring a civil action**
A civil action may be brought—
(1) by a participant or beneficiary—
(A) . . .
(B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan[.]

be undisputed in their respective motions for summary judgment:

(a) Plaintiff is a former sales employee of XL/Datacomp, Inc.

(b) While employed by XL/Datacomp, Inc., plaintiff was a participant in an employee welfare benefit plan providing long term disability benefits (the "plan").

(c) The plan is regulated by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*

(d) The plan provides the plan administrator and other plan fiduciaries discretionary authority to interpret plan terms and to determine eligibility for and entitlement to plan benefits.

(e) Plaintiff applied for disability benefits under the plan on January 21, 1994.

(f) MetLife responded by sending questionnaires to plaintiff's treating physicians.

(g) MetLife sent plaintiff's medical records to Dr. Julian Freeman.

(h) Dr. Freeman conducted a review of plaintiff's records and concluded that he could not identify any incompatibility between plaintiff's specific functional capacity and his job performance.

(i) Dr. Freeman examined additional information submitted by plaintiff, and issued a follow-up report dated May 16, 1994, concluding that plaintiff's functional limitations did not preclude him from working at his job.

(j) MetLife determined that plaintiff was not eligible for disability benefits.

(k) Plaintiff was informed of MetLife's determination by letter dated May 25, 1994.

(*l*) Plaintiff, through counsel, submitted a formal appeal of the decision on July 20, 1994.

(m) Plaintiff submitted additional information for MetLife's review.

(n) MetLife sent plaintiff's additional submissions on to Dr. Freeman for evaluation.

(*o*) Dr. Freeman submitted supplemental reports dated August 4, 1994 and October 20, 1994.

(p) MetLife sent a letter dated December 1, 1994 to plaintiff's attorney, requesting plaintiff to undergo an independent medical examination.

(q) Under the terms of the plan, when a claim is pending, MetLife has the right to have a claimant examined by doctors of its choice, at MetLife's expense, when and as often as it reasonably chooses.

(r) Plaintiff did not attend an independent medical examination scheduled by MetLife, although the reasons for not attending such an independent medical examination are in dispute.

(s) MetLife closed its handling of plaintiff's long term disability claim by letter dated February 6, 1995.

(t) Plaintiff commenced this lawsuit on February 15, 1995.

**Standard of Review for Summary Judgment**

Pursuant to Fed.R.Civ.P. 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The moving party has the burden of showing the absence of a genuine issue concerning any material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The moving party's burden may be met by identifying those portions of the record demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In determining whether these burdens have been met, the court is required to examine all evidence in the light most favorable to the non-moving party. *Barber v. General Electric Co.*, 648 F.2d 1272, 1276 n. 1 (10th Cir. 1981).

Once the moving party has met its initial burden, the burden shifts to the party resisting the motion. That party must "make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Manders v. Oklahoma ex rel. Dept. of Mental Health*, 875 F.2d 263, 265 (10th Cir.1989) citing *Celotex*, 477 U.S. at 325, 106 S.Ct. at 2553–54.

## Discussion

■ Actions challenging the denial of benefits under an ERISA plan are subject to *de novo* review, unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan. In the event that the administrator or fiduciary does have such authority, review of the decision to deny benefits will be under an arbitrary and capricious standard. *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 956–57, 103 L.Ed.2d 80 (1989). *See also Winchester v. Prudential Life Ins. Co. of America,* 975 F.2d 1479, 1483 (10th Cir.1992).

In this case, the plan specifically provides as follows:

### DISCRETIONARY AUTHORITY OF PLAN ADMINISTRATOR AND OTHER PLAN FIDUCIARIES

In carrying out their respective responsibilities under the plan, the plan administrator and other plan fiduciaries shall have discretionary authority to interpret the terms of this plan and to determine eligibility for and entitlement to plan benefits in accordance with the terms of the plan. Any interpretation or determination made pursuant to such discretionary authority shall be given full force and effect, unless it can be shown that the interpretation or determination was arbitrary and capricious.

METLIND at 00583.

■ Here, the plan gives the administrator discretionary authority to determine eligibility for benefits. Accordingly, review of the administrator's actions will be under the arbitrary and capricious standard. *Bartlett v. Martin Marietta Operations Support, Inc. Life Ins. Plan,* 38 F.3d 514, 517 (10th Cir.1994); *Sandoval v. Aetna Life and Casualty Ins. Co.,* 967 F.2d 377, 379–380 (10th Cir.1992).[4] Furthermore, in determining whether the plan administrator's decision was arbitrary and capricious, "the district court generally may consider only the arguments and evidence before the administrator

---

4. In the *Sandoval* case, the Tenth Circuit discussed the arbitrary and capricious standard at length in footnote 4. It noted: "In our view, both lack of substantial evidence and a mistake of law would be indicia of arbitrary and capricious actions and thus may be subsumed under the arbitrary and capricious label. See *Danti v. Lewis,* 312 F.2d 345, 348 (D.C.Cir.1962). Other potential indicia of arbitrary and capricious actions include bad faith or conflict of interest by the fiduciary. See, e.g., *Bruch,* 489 U.S. at 115, 109 S.Ct. at 956." 967 F.2d at 380, n. 4.

In this case, the plaintiff has argued that Met-Life's position as administrator and insurer has created a conflict of interest situation. This Court agrees, insofar as MetLife's potential conflict must be "weighed as a 'facto[r] in determining whether there is an abuse of discretion.' Restatement (Second) of Trusts § 187, Comment d (1959)." *Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 957, 103 L.Ed.2d 80 (1989). It defies fact to say that MetLife does not have a potential conflict of interest in a case where it has issued a group disability policy naming the employer, XL/Datacomp as insured, and will be required to pay disability claims under the terms of that policy, something that would be adverse to its own economic interests.

For further authority in accord with this general proposition, see also *Pitman v. Blue Cross and Blue Shield of Oklahoma,* 24 F.3d 118, 122–123 (10th Cir.1994); and *Sage v. Automation, Inc.*

Pension Plan and Trust, 845 F.2d 885, 895 (10th Cir.1988), in which the Tenth Circuit stated:

> Moreover, we agree with Judge Posner's analysis in *Van Boxel v. Journal Co. Employees' Pension Trust,* 836 F.2d 1048, 1049–53 (7th Cir.1987), that the arbitrary and capricious standard is sufficiently flexible to allow a reviewing court to adjust for the circumstances alleged, such as trustee bias in favor of a third-party or self-dealing by the trustee.

Judge Posner, in his *Van Boxel* opinion, cited in the foregoing excerpt from *Sage,* stated further:

> Van Boxel challenges the "arbitrary and capricious" standard. We are not entirely unsympathetic to the challenge, and notice that although the weight of authority is against him there is growing skepticism about the orthodox approach. The skeptical tendency, illustrated by dicta in *Varhola v. Doe, supra,* 820 F.2d [809] at 813 [ (6th Cir.1987) ], has culminated in the Third Circuit's recent decision in *Bruch v. Firestone Tire & Rubber Co.,* 828 F.2d 134, 137–45 (3d Cir.1987), which holds that, whenever someone who is not a plan beneficiary is in a position to benefit from the rejection of a claim—the company, for example—no deference should be given the trustees' decision; the case should be treated as an ordinary contract dispute between the claimant and the trust. See *id.* at 145. ...

*Van Boxel,* 836 F.2d at 1049 (some citations omitted).

at the time it made that decision." *Sandoval*, 967 F.2d at 380.

The Tenth Circuit also has stated:

"Contract language in an ERISA plan is to be given its plain meaning." *Rodriguez–Abreu v. Chase Manhattan Bank*, 986 F.2d 580, 586 (1st Cir.1993); see also *Burnham v. Guardian Life Ins. Co. of America*, 873 F.2d 486, 489 (1st Cir.1989); *Phillips v. Lincoln National Life Ins. Co.*, 978 F.2d 302, 308 (7th Cir.1992); *Brewer v. Lincoln National Life Ins. Co.*, 921 F.2d 150, 154 (8th Cir.1990).

*Bartlett*, 38 F.3d at 517.

The pertinent provision of the plan at issue in this case provides:

**Total Disability or Totally Disabled** means that, due to an Injury or Sickness, you:

a. are completely and continuously unable to perform each of the material duties of your regular job; and

b. require the regular care and attendance of a Doctor.

You will also be considered Totally Disabled when, due to an Injury or Sickness, you suffer a 50% loss of earnings capacity and require the regular care and attendance of a Doctor.

■ In its brief, MetLife has argued that the controlling plan language simply requires that a claimant be unable to perform the material duties of his job due to an injury or sickness, a determination to be made by MetLife as plan administrator and to be assessed under an arbitrary and capricious standard. MetLife has argued, that because:

Plan language focuses on the ability of the claimant to "perform each of the material duties" of his job on a complete and continuous basis, and because MetLife believes it should base its determinations on objective information, MetLife looks for *specific information* concerning the claimant's *actual functional capacity* to perform his job duties.

Defendant's Brief, at page 17 (emphasis in original).

■ Defendant has argued that the second alternative in the plan language for determining when an individual is totally disabled and entitled to long term disability benefits requires plaintiff to establish that his 50% loss of earnings capacity was due to an injury or sickness, which "requires evaluation of plaintiff's functional capacity." MetLife Brief in Opposition at 17–18. This second alternative for determining provides as follows:

You will also be considered Totally Disabled when, due to an Injury or Sickness, you suffer a 50% loss of earnings capacity and require the regular care and attendance of a Doctor.

The plan does not include express definitions for any of the terms relied upon by MetLife in support of its position, such as "functional capacity." The plan does not define "50% loss of earnings capacity." The plan does not state or describe whether "earnings capacity" is to be distinguished from a "loss of income" or whether "50% loss of functional capacity" is something different than a "50% loss of income" or "50% loss of earnings capacity." The policy language is ambiguous in that it fails to provide definitions for either of these terms, although the insurer clearly is in the position to include such definitions in the express policy had it desired to do so. Because the policy is ambiguous in this regard, applicable rules of construction require this Court to construe the policy in favor of the insured and in favor of coverage. See e.g., *Wolf v. Prudential Ins. Co. of America*, 50 F.3d 793, 799–800 (10th Cir.1995) (Oklahoma law); *Blair v. Metropolitan Life Ins. Co.*, 974 F.2d 1219, 1221 (10th Cir.1992); *Hansen v. Continental Ins. Co.*, 940 F.2d 971, 982 (5th Cir.1991):

In contracts of insurance generally, ambiguities are resolved against the drafter.... The same rule should apply here; the ambiguity in the summary plan description must be resolved in favor of the employee and made binding against the drafter. Any burden of uncertainty created by careless or inaccurate drafting of the summary must be placed on those who do the drafting, and who are most able to bear that burden, and not on the individual employee, who is powerless to affect the drafting of the summary of the policy and ill equipped to bear the financial hardship that might result from a misleading or confusing document. Accuracy is not a lot to ask. And it is especially not a lot to ask

in return for the protection afforded by ERISA's preemption of state law causes of action—causes of action which threaten considerably greater liability than that allowed by ERISA.

*Hansen,* 940 F.2d at 982.

The parties, in their respective memoranda, do not seriously dispute that plaintiff has indeed suffered a "50% loss of earnings capacity" and has required the regular care and attendance of a doctor. The dispute arises in the problem area of whether this loss of earnings capacity has been due to an "Injury or Sickness." MetLife's paid medical consultant, Dr. Julian Freeman, wrote several letters expressing opinions regarding plaintiff's medical condition after reviewing medical information provided to him, and which he subsequently provided to three other reviewers of his selection, Drs. Cohn, Melnicoff, and Adams.[5] Dr. Freeman writes, in a letter dated April 29, 1994, that "[disability is alleged due to continued epididymitis, or other causes of pain[,]" and that "[n]o precise or definite diagnosis can be fully confirmed from the information provided." He continues, in that same letter:

**Functional Capacity:**

In assessing functional capacity, an initial step needed was to reach some hypothetical situation regarding diagnosis. Although there is some indication of psychiatric illness, we presume the primary factor in the physical symptoms was indeed a physical illness, due to the intermittent

confirmation of testicular area swelling, and rather specific relief of pain and possibly swelling by antibiotics. We then assumed the pain was due either to persistent infection with any of the above organisms, to an autoimmune process or vasculitis, or both. Considering all available information, but assigning major weight was above, we concluded the individual was capable of lifting and carrying 50 pounds very rarely, 10 pounds frequently, 20 pounds occasionally, walking and standing 4–6 hours a day in divided periods, sitting for 8–10 hours a day, with no running, no jumping from heights, no exposure to substantial levels of vibration, occasional climbing of stairs and very minimal ladder climbing, and occasional crouching.
\* \* \* [The letter then discusses the bases for concluding that the plaintiff retained the degree of function.]
From medical grounds, alone, we were unable to identify any incompatibility between the above functional capacity and the requirements of past work as described in the information provided.

METLIND at 00404–00407.

Dr. Freeman continues, in all subsequent correspondence, to discuss the functional capacity of plaintiff, and concludes in each letter that no incompatibility between functional capacity and the requirements of plaintiff's work can be identified. See e.g., METLIND at 00372–00375, METLIND at 00077–00081, METLIND at 0050–0052.[6] A continuing

---

5. The record is not entirely clear as to what information was provided by Dr. Freeman or MetLife to the three other physicians for review concerning plaintiff's medical history or as to the procedure utilized by the "panel" to reach a collective opinion concerning a particular claimant under review. Dr. Freeman's deposition indicated that he selected and paid the three other reviewing physicians somewhere between $100 and $600 per hour. Freeman deposition at 22–25. He indicated that the physicians, when asked to participate in such a review, generally did so through verbal discussion, with no written records kept of the "panel's" findings. *Id.* at 26–29. He had no records available during his deposition documenting what materials had been reviewed, by whom those materials had been reviewed, or the amount of time spent on such review.

6. Dr. Freeman later writes, in a letter dated 5–16–94, in part following receipt of a 5/4/94 report from a treating physician:

\* \* \* Disability is alleged due to testicular and groin pain, fatigue and loss of stamina, loss of alertness, attention deficit, and other medical problems.

He then goes on to assess functional capacity, and states:

From medical grounds alone, we remain unable to identify any incompatibility between the above functional capacity and the requirements of past work as described in the information provided. This comparison from a medical standpoint includes the considerations of substantial driving, levels of concentration and reasoning appropriate to higher level executive activities, 12–14 hour work days, and mental or physical stamina within the general exertional range outlined above.

METLIND at 00372–00375.

By letter dated 8–4–94, Dr. Freeman writes, after stating that "Disability is alleged due to an undefined illness[,]" and then goes on to assess plaintiff's functional capacity:

theme in Dr. Freeman's correspondence with MetLife is that no definitive diagnosis of plaintiff's condition had been confirmed by any of his treating or examining physicians, although there is no requirement for a confirmed diagnosis in the plan at issue.

In his deposition, Dr. Freeman stated that his primary areas of practice were neurology and general internal medicine. Freeman Deposition, at 6. Over a ten year period, Dr. Freeman had spent the majority of his time working with attorneys and insurance companies and sees few patients. He states that he has been consulting for MetLife approximately three years. *Id.* at 12. During his deposition, he described functional capacity analysis as:

an analysis of the expected level of physical or mental activity of the individual as described in the medical records provided and it is—in our analysis we also use a worse case scenario.

In other words, we assume all worse case findings or diagnoses that we possibly can, that it represents a least possible function rather than a greater, maximum

... Considering all available information, but assigning major weight as above, we concluded the individual was acutely ill with a recent febrile illness, probably infectious (based on the axillary node enlargement) in 6/94. From about 6/1/94 through approximately 7/1/94, and again for a few days in mid–7/94, he was incapable of sustaining more than an 8 hour work day, due to this recent and acute febrile illness. At other times, capable of lifting and carrying over 60 pounds very rarely, 15 pounds frequently, 30 pounds occasionally, walking and standing 6–8 hours a day, sitting for 8–10 hours a day, with no operation of equipment with high levels of vibration or off paved surfaces.

METLIND at 00077–00081.

Then, again Dr. Freeman writes, by letter dated 10–20–94:

Disability is alleged due to undefined illness.

\* \* \* \* \* \*

In re-assessing functional capacity, primary weight was given to the originally considered indications of underlying disorders (including the presumption of a number of diagnoses additional to those of the treating physicians) and the recent indications of possible multiple sclerosis or other spinal cord disease. Considering all available information, but assigning major weight as above, we concluded the individual was capable of lifting and carrying over 60 pounds very rarely, 30 pounds occasionally, 15 pounds frequently, walking and standing 6–

capacity. Basically to the insurance company in comparing it to the requirements of either the person's past work or any work, they can make their own decisions whether the person is or is not disabled, or any other decision they need to make.

*Id.* at 44. He goes on in that deposition to state the following:

Q. Okay. Do you require, when you do one of these functional capacity analyses, do you require that you be furnished with a specific list of the claimant's job duties before rendering an opinion?

A. No, because the two are independent. In other words, the functional capacity analysis is done independent of what the job duties are. The functional capacity analysis is based on the medical information coming in.

Q. So you don't really care what the— what a specific claimant's job duties are when you render a functional capacity analysis; is that correct?

A. Correct. And in some cases we don't even know what it is either, because

8 hours a day, sitting for 8–10 hours a day, with no driving on unpaved roads or operation of high vibration equipment, except for limited periods of lesser function during acute infectious illness (6/1/894–7/1/94) or renal colic (mid 7/94).

The main reasons for concluding this degree of limitation existed were the prior indications of acute febrile illness, possible renal colic, and the tissue pathology noted.

The main basis for concluding this degree of function was retained is materially the same as listed before. Recognizing that a significant neurologic disorder involving the brain and spinal cord may be present and reflected in the bladder dysfunction, this is only one possible explanation. Even if multiple sclerosis is present as the cause, the neurologic effects have been very mild, and in the absence of defined neurologic abnormalities, would not have increased the degree of limitation beyond that stated above.

From medical grounds alone, we remain unable to identify any incompatibility between the above functional capacity and the requirements of past work as described in the information provided.

As before, the current estimate of function incorporates a number of presumed diagnoses that are additional to, and more severe than those of the treatment sources. As a result, functional capacity may be underestimated.

METLIND at 0050–0052.

the specific job duties are not even in question for the insurance company examiner's own occupation disability question that they are looking at.

Q. So how do you come up with a functional capacity analysis that would inform an insurance company whether or not there are limitations on a claimant's ability to work if you don't know what the claimant's work is?

A. We give them a fairly comprehensive statement of what the person can or can't do and hopefully in the initial information the insurance examiner has had enough experience to ask us about any specific questions that might arise that go beyond the usual general responses. If the insurance examiner has questions that we have not answered because the questions weren't asked or our answer in summary was incomplete, they can ask us to address that issue specifically.

Q. How often does that occur?

A. It's not very common.

Q. It's in fact very rare, is it not?

A. Yeah, fairly rare.

*Id.* at 46–48.

The plan language includes no requirement that plaintiff have no functional capacity to perform his job. Furthermore, Dr. Freeman did not know the material duties of plaintiff's regular job. It appears that such a determination relative to a claimant's functional capacity is, at best, only one of the tools in the insurance company's available arsenal that may be used to assist in making the decision regarding any particular claimant's entitlement to long term disability benefits. The facts now before the Court further suggest that MetLife may make inappropriate use of independent medical consultants such as Dr. Freeman by placing too much reliance on opinions that fail to identify adequately the bases for the independent medical consul-

tant's opinion, and by failing to give adequate consideration to the opinions of treating physicians who have actually examined and treated a claimant over a period of time.

The Court takes note of plaintiff's fundamental disagreements concerning Dr. Freeman's assessments of plaintiff's "functional capacity" as it affects his entitlement to long term disability benefits. The Court also takes note of defendant's argument that the second policy provision pertaining to entitlement to benefits requires evaluation of plaintiff's functional capacity, although this is in the complete absence of any plan language to that effect. That absence of express plan language is significant to the Court and is pivotal to resolution of the dispute between the parties in this case. Under the undisputed facts of this case, it is apparent that plaintiff is entitled to benefits because he comes squarely within the plan language providing as follows:

> You will also be considered Totally Disabled when, due to an Injury or Sickness, you suffer a 50% loss of earnings capacity and require the regular care and attendance of a Doctor.

██ The language employed, i.e., "You will also be considered Totally Disabled," makes clear that this is an alternative means of determining whether a claimant is entitled to disability benefits. Because of his sickness [7] and because plaintiff has required the regular care and attendance of a doctor [8] and because it further appears to be undisputed that plaintiff has suffered a 50% loss of earnings capacity due to his sickness, plaintiff is entitled to receive long term disability benefits under the express language of the plan.

After his claim was denied, plaintiff provided MetLife with various materials regarding his condition, including letters of clarification

---

**7.** The Plan defines "sickness" as "illness, disease or pregnancy."

**8.** The plan does not provide express definitions relating to "regular care and attendance of a doctor." However, it does define "doctor" to mean "a person who is legally licensed to practice medicine. A licensed practitioner will be considered a Doctor if:

  a. There is a law which applies to This Plan and that law requires that any service per-

formed by such a practitioner must be considered for benefits on the same basis as if the services were performed by a Doctor; and

  b. The service performed by the practitioner is within the scope of his or her license."

The plan also provides that "Medical Advice or Treatment" means

  "a. medical treatment or consultation;

  b. medical care or services;

  c. diagnostic tests; or

  d. taking of prescribed drugs or medicines."

from physicians that had examined and treated plaintiff. Dr. Robert L. Cox, by letter dated July 12, 1994, wrote to clarify his previous communication regarding the disability of plaintiff. Dr. R. Cox notes that he was:

... unable to determine the presence of any infection despite his apparent symptomatic improvement with intermittent courses of antibiotics. I stated that I was unable to declare him disabled due to an infectious process.

I want to make it clear that I am not stating that this patient should not be disabled. The determination should be made by a disability specialist, particularly with the medical opinion of his primary care physician, Dr. Gordon Ehlers. Dr. Ehlers is in a position to evaluate the patient in a broader sense than was the scope of my infectious disease consultation. It may be perfectly reasonable and appropriate for Mr. Lindsey to be declared disabled for medical reasons. It is in fact possible that the etiology of his disability might be due to an infectious process which has yet to be clarified. My statement regarding disability should not be interpreted beyond it's [sic] specific intended message, that being I was unable to diagnosis [sic] a specific infection which would render this patient disabled.

METLIND at 00147.

Dr. Ehlers, by letter dated May 4, 199[4], writes to MetLife:

I am Sam Lindsey's primary care physician. This letter is in response to your denial of consideration of extended disability compensation for Mr. Lindsey. I have Dr. Julian Freeman's evaluation for review. I would like you to reconsider your denial based upon the following information. Sam Lindsey is a 44–year–old previously healthy male who works as a commissioned salesman in financial and data processing products. His occupation requires extensive travel, long hours, group presentations, and extensive time spent preparing for meetings. Normal performance of his usual occupation requires a high level of alertness, as well as both physical and mental stamina.

The patient's current medical problems began in June of 1991, after persistent back pain, the patient was found to have a right kidney tumor. This was found to be an angiomyolipoma, and was excised with a nephrectomy. Although the patient's recovery was protracted, he did eventually recover, seemingly completely, and was able to return to work fully and productively.

Unfortunately, beginning in early 1992, the patient began to develop persistent right groin pain, low grade fever, and malaise. He was seen in the emergency room on several occasions in early 1992 because of abdominal pain. Ultimately, he was re-evaluated by his urologist, Dr. H. David Cox, in June of 1992. MRI of the abdomen and bone scan were done at that time, and were both negative. The patient was treated with antibiotics at that point, and again for a documented urinary tract infection in September of 1992 with apparent transient improvement, however, unfortunately, since then, he's had persistently recurring right groin pain, exacerbated by activity, persistent fatigue, and malaise, as well as a persistently increased need for sleep. This continued throughout the latter part of 1992, despite being treated on several occasions with antibiotics for presumed prostatitis or epididymitis. During September of 1992, he took Cipro for three weeks, with apparent improvement. He saw me in December of 1992, had a recurrence of symptoms, and was treated once against with Cipro. He seemed to improve gradually, however, his improvement did not last. He was once again bothered through early 1993 with fatigue, malaise, and low grade fever. He had persistent right groin and right epididymal pain with occasional swelling. During this period of time, he was seen on multiple occasions by his urologist, Dr. H. David Cox.

In early 1993, I also evaluated the patient for possible adult attention deficit disorder. He was evaluated then by a neurologist, Dr. Beverly Gilder, as well as a psychologist, Dr. Lewis. Dr. Lewis' impression was that of adult attention deficit disorder, and, we elected to treat him at that time on a trial basis with Ritalin. He seemed to improve regarding his ATD type symptoms with Ritalin initially, however, this

improvement did not last. He took Ritalin for several months before discontinuing it. Because of the likelihood of a dysthymic disorder or depression, we ultimately started him on Prozac 20 mg daily, beginning in September of 1993. The Prozac has had a remarkably beneficial effect on his degree of depression and his ability to concentrate, however, it has not helped his underlying constitutional symptoms, namely, fatigue, malaise, lack of endurance, increased need for sleep, recurring low grade fevers, and right groin pain. Through early 1993, he was treated recurrently with Cipro and doxycycline both of which seemed to temporarily improve his epididymitis. He was seen also on several occasions by Dr. H. David Cox. Eventually, because of persistent enlargement and tenderness of the right epididymis, he under right epididymectomy in August of 1993 in an attempt to definitively cure his chronic epididymitis.

I saw the patient approximately one month after his surgery, in September of 1993, at which time we started him on Prozac because of depression which he felt was related to his prolonged illness. As noted above, the Prozac has had a beneficial effect. He continued, however, to feel "exhausted". During the fall of 1993, he continued to have a very low level of energy, increased need for sleep, difficulty with stamina, severe enough to preclude his returning to work. By November of 1993, he had redeveloped right groin and testicular pain without dysuria. Examination done by me in November of 1993 showed some swelling and tenderness of the right testicle with some right inguinal tenderness without adenitis. Prostate was soft and tender, urinalysis was normal. At that point, because of presumed orchitis and prostatitis, we treated him with Cipro 500 mg b.i.d., and the anti-inflammatory Lodine. He once again was seen by Dr. H. David Cox for his presumed prostatitis, and, we also referred him to Dr. Robert Cox in December of 1993 for infectious disease evaluation. You have, I believe, copies of Dr. Cox's evaluation. In short, Dr. Robert Cox was unable to document any ongoing infectious disease problem. Nonetheless, the patient continues to have recurring low grade fevers from 99.5 to 100.5, recurring sporadic episodes of right testicular pain, right groin pain, and persistent malaise as noted above. These seem to respond to antibiotics, though temporarily.

At this point, the patient requires ten to twelve hours of sleep per night, and, when he has attempted to resume even limited approximations of his usual work schedule, he'd been unable to do so. Increased activity is associated with a prolonged need for sleep subsequently, as well as a recurrence of pain of the right groin.

I have referred Mr. Lindsey to Dr. Dan Perlman for an infectious disease re-evaluation for consideration of possible occult seminal vesiculitis, recurrent, versus, some other diagnostically obscure infectious disease problem. I do not feel that the patient's problems are emotional at this time, as, the understandable depression that he was experiencing as a result of his prolonged physical problems now seem to be markedly improved with Prozac. I would appreciate your reconsideration of your denial of Mr. Lindsey's disability status, particularly pending the infectious disease re-evaluation.

METLIND at 00144–00146.

This letter is followed by a letter from Dr. Ehlers dated July 18, 1994:

This letter is in follow up of my detailed letter of May 4, 1994 (which unfortunately is mistyped as May 4, 1993). Since May of this year, Mr. Lindsey has continued to have low grade fever, up to 100 degrees or so, with each re-exacerbation of fever accompanied by malaise, fatigue, aches, and occasionally chills. These episodes occur on nearly a daily basis, at least several times per week. On several occasions, in addition, Mr. Lindsey has experienced episodes of swollen lymph nodes, particularly in the neck an in the groin, but occasionally involving those in the arm pits. These lymph node swellings come and go, and are roughly associated with the exacerbations of his fever and malaise. Since approximately the first part of June, the patient has been attempting to work. He is able to put in about four hours a day or so, at

less than full speed, and, has found that this effort has increased his need for sleep and has left him exhausted.

The patient continues to be involved in infectious disease follow up with Dr. Dan Perlman, and, is being observed off antibiotics at this point.

I have seen the patient on a couple of occasions, since mid-June, and, on each occasion, we have documented temperatures as high as 100 to 100.5 Fahrenheit, intermittent lymph node enlargement, and he has reiterated the exhaustion that he is subject to.

The last time I saw Mr. Lindsey was 7–15–94, at which time he had an episode of two or three days worth of left sided flank and back pain. This also was associated with an exacerbation of fever. His urinalysis was essentially normal on a couple of occasions, an IVP (kidney x-ray involving the injection of dye) showed normal anatomy of his one remaining (left) kidney and collecting system.

At this point, although Mr. Lindsey's medical problems is undiagnosed, he certainly is disabled for full-time work. Even the half-time schedule that he is following is difficult for him, and, I am concerned that, if he should become overly tired or exhausted, it may make him more vulnerable to secondary infections. If you have any questions, please do not hesitate to contact me.

METLIND at 00143.

Also included in the claim file is a letter dated July 19, 1994, from Dr. Henry Frey, at METLIND at 00138–00141. Dr. Frey met with plaintiff for a clinical psychiatric evaluation, and he also reviewed all available medical materials and Dr. Freeman's April 29, 1994 letter expressing concerns about the possible presence of psychiatric illness. Dr. Frey writes, in part:

> ... my firm belief is that Mr. Lindsey's primary goal centers about a return to normal health and a full level of functioning. The two medications which have been prescribed over the recent past have been of some help. The mood elevating and energizing effect of Ritalin was of value for a limited period. The current use of Prozac at the 20 mg. level, also has been of assistance in Mr. Lindsey's determined ef-

forts to cope during this extraordinarily difficult and frightening period. I believe the profound effect of the stressor of Mr. Lindsey's chronic illness and associated surgeries, with its destabilizing effects on virtually every aspect of his life has resulted in the reactive psychiatric condition often seen in such situations. His condition is consistent with Adjustment Disorder with Mixed Anxiety and Depressed Mood. Although the symptoms of that Adjustment Disorder most likely would be ameliorated by psychotherapeutic assistance accompanied by a possible increase and/or modification of his medication program, I believe with certainty it would not resolve until the underlying primary physical illness is brought under control.

METLIND at 00141.

Dr. Daniel Perlman, an infectious disease specialist, in a letter dated July 19, 1994, writes:

> I have been following Sam since 4/25/94 (6 visits prior to today). Sam has an undefined illness which causes him to be "Totally Disabled" per the definition of his insurance policy. He continues to have pain and fevers which are unexplained. His workup is proceeding, however in the interim, he cannot function anywhere near his healthy, prior baseline. Call me if you have any questions.

METLIND at 00142.

In this case, plaintiff has relied upon a number of cases he contends support a finding that MetLife's disposition of his claim for disability benefits was arbitrary and capricious. Both parties have cited *Oien v. Co-Op Retirement Committee*, 709 F.Supp. 917 (D.S.D.1989), in which the Court stated:

> While the Court believes that the review by medical consultant is appropriate in these cases, it is the Court's view that in order for the medical consultant's opinion to amount to evidence supporting a decision of no disability that opinion must point to evidence in the record supporting it and must be based on all of the evidence. The medical consultant's opinion cannot, when refuted by the opinions of all the treating

and examining physicians, create an evidentiary basis for denying the claim.

*Oien,* 709 F.Supp. at 924.

The Court believes this case is also unlike *Donato v. Metropolitan Life Insurance Co.,* 19 F.3d 375 (7th Cir.1994), authority cited by defendant. In *Donato,* the district court had determined that MetLife's decision to deny disability benefits "simply came down to a permissible choice between the position of UMAC, MetLife's independent medical consultant, and the position of Ms. Donato's clinical ecologists, Drs. Shambaugh, Randolph, and Ross." 19 F.3d at 380. "The position of UMAC was that Ms. Donato's hypersensitivity, based on clinical ecology, which is not supported by the AMA, the American College of Physicians, or any other recognized medical body, was not an acceptable ground for finding total disability. Plainly, MetLife acted entirely reasonably in denying benefits for a disability based on such a questionable medical theory." *Id.*

■ In this case, there is a conflict between the opinion of MetLife's independent medical consultant and his collected panel of reviewers and the physicians that had examined and treated plaintiff over a period of years. This is not a case where physicians are asserting questionable medical theories in support of plaintiff's disability claims. What the record does disclose is that all of the physicians that had examined and treated plaintiff were unable to reach a definitive diagnosis for plaintiff's numerous physical complaints. Even Dr. Freeman could only speculate as to appropriate diagnoses for plaintiff's condition. Additionally, Dr. Freeman's opinion was limited in nature, i.e., that there was no incompatibility between plaintiff's functional capacity and his ability to perform the material duties of his job.

MetLife describes the role of the medical consultant in the following manner:

When MetLife requests an independent medical consultant review a file, the only information requested pertains to the medical status of the insured. We require a full review of all records, tests, x-rays, and operative reports. These are put together into a comprehensive report that gives any restrictions/limitations that may be present.

We then interpret and decide benefit eligibility based on the Plan provisions. We use a medical consultant as a comprehensive medical reviewer and apply the Plan provisions to the issues at hand. Therefore, we ask that Mr. Lindsey's physicians respond to the Dr. Freeman consult report. As always, if there is any medical disagreement, objective reasons must be supplied, along with any appropriate rationale.

METLIND at 00068.

MetLife's description of the use of medical consultant to review and apply plan provisions does not comport with what occurred in this case. Dr. Freeman himself admitted, in his deposition, that he was not aware of applicable plan provisions. He stated that when a file is received, he and the other medical reviewers he selects to work on any particular case, would "analyze the medical information provided, with regard to medical diagnoses and functional capacity and any other medical issues we saw relevant." Freeman Deposition at 32. The following dialogue occurred during his deposition:

Q. When you render one of these opinions for Met Life, have any these opinions ever involved a finding that the insured which was referred to you was actually disabled or not disabled pursuant to an insurance policy?

A. No. That opinion has never been expressed.

Q. So you have never, you're relatively comfortable or confident that you've never made a finding that a Met Life Insured is disabled using the policy language of Met Life: is that right?

A. Yes.

Q. Have you ever even seen a Met Life disability policy?

A. No.

Q. Have you ever reviewed or read or had read to you the Met Life policy definition of disability?

A. No.

Q. To this day, do you have any idea what that definition is?

A. Only the vaguest.

Q. What is that vague understanding?

A. That some of the policies make a distinction between the ability to do one's own occupation versus other occupations, that there is some relationship to earnings level and that there are some limitations on types of illnesses being covered.

Q. And how did you come by that understanding?

A. The nature of the specific concerns that some of the examiners have raised in their referral forms.

Q. I take it, then, even that understanding that you've acquired in somewhat of a vague form, that that isn't anything that you utilize or rely upon when you do a record review of a Met Life referral, would that be an accurate statement?

A. With one exception. That if the examiner has previously indicated on our question form to them as to what concerns, what special concerns exist, if they indicate that they are only concerned about the insured's ability to return to their prior occupation, then sometime if we can define incompatibility between that work as described to us in our medical findings, we don't attempt to formulate a complete functional capacity to say they could do other work.

Q. Now, was that done in Sam Lindsey's case, in any way?

A. I don't recall.

Q. Do you recall receiving any insurance instructions at all about what you were to do or not to do in the Lindsey case?

* * * [objection omitted]

A. Right. We never received instructions. I remember we did receive information at some stage, it may have been at the first review or later reviews, where the examiner had a very specific question about the ability to drive a car for some hours at a time, and we took special care to look into that question and try and address it in the report.

Q. Okay. Well—

A. I know there was other information provided.

Q. Did you make any finding at all in any form that Sam Lindsey was either disabled or not disabled under the Met Life policy?

A. We didn't make any—arrive at any conclusions nor state any conclusions in that regard.

Q. Did you even attempt to do so?

A. No.

Q. And why is that?

A. Because our basic previous agreement was we would provide a medical review of a medical question and we didn't consider—I didn't consider the presence of absence of some legally defined disability to be a medical question.

Q. How did you even know when you got the Lindsey file that the file was being sent to you as a disability claim or did you know that?

A. We knew it had something to do with disability because prior discussions with Vocational Resources were that the unit of Met Life sending the cases did not handle life insurance or health insurance problems and, therefore, didn't need to know about causes of death. In addition, obviously, Mr. Lindsey was still alive, and they also didn't need to know about present necessity or necessity of treatment or paying the bill.

Q. Is that the only way you in [sic] knew it was a disability claim?

A. Yeah.

Q. And your idea of what you were to do with the file once it was received was a general pre-determined agreement with Vocational Resources about reviewing such claims; is that accurate?

A. That's accurate.

Q. And that pre-determination, explain that to me again, what's your understanding of what Vocational Resources wanted you to do with such a claim once you received it?

A. That we would go through the medical information provided and provide, es-

sentially, a consensus panel review rather than the opinion of any one physician and that it would address questions of diagnosis, either established or probable, medical condition likely present and the expected functional capacity, plus any other general medical comments we felt were relevant.

Q. Do you always use a functional capacity analysis in rendering opinions to Met Life under disability claims?

A. Yes. . . .

Freeman deposition at 39–43.

While Dr. Freeman and his selected panel of reviewers may have been requested to review medical information provided, he, as an independent medical consultant, had no knowledge of plaintiff's job duties, nor was he aware of applicable plan provisions. It is also evident from a review of the claim file that the treating and examining physicians disagreed with Dr. Freeman's assessment of plaintiff's medical condition, as evidenced by their many follow-up letters to MetLife following the initial claim denial. *See e.g.,* Dr. Burnham's letter, METLIND at 00043–00046; Dr. Ehlers' October 21, 1994 letter, METLIND at 00048–00049; Allen Berger, D.C. September 22, 1994 letter, METLIND at 00053–00054; Finke Letter enclosing clinical evaluation made by H. David Cox, METLIND at 00057–00064; Dr. H. David Cox July 25, 1994 letter, METLIND at 00090; and the various other letters previously referenced in the foregoing portions of this Order.

The Court offers the following observations with respect to defendant's arguments concerning plaintiff's alleged refusal to undergo an independent medical examination. The claim file indicates that MetLife determined plaintiff should undergo an independent medical examination after receiving apparently conflicting evidence concerning plaintiff's medical condition. MetLife began attempting to make arrangements for such an examination with a neuropsychiatrist in December of 1994, with the confirmation letter sent to plaintiff's former home address in Colorado. He had, at that time, relocated to Cheyenne, Wyoming. METLIND at 00026. The confirmation letter stated that the appointment was to be in Denver on January 12, 1995. By letter dated December 28, 1995 to plaintiff's attorney, MetLife stated it was "in the process of setting up an Independent Medical Examination at MetLife's expense." METLIND at 00031. Another letter, dated December 21, 1994, was sent to plaintiff at his Englewood address, without any indication that a copy was sent to his counsel, advising plaintiff that he was to appear for an examination in Denver on January 12, 1995. METLIND at 00033.

There are additional letters between plaintiff's attorney and MetLife regarding the arrangements for independent medical examination in the claim file. However, upon review, this Court is unable to conclude that plaintiff willfully determined he should not appear for an independent medical examination or that he personally had received notice of the arrangements that were to have been made for that examination. What is reflected is a flurry of confused communications that should not be used as the basis for denying plaintiff recovery of disability benefits. To deny plaintiff recovery on the basis of such woefully thin shreds of evidence would be inappropriate and unjustified in this case.

### Conclusion

Because there is nothing in the record to suggest that MetLife ever considered whether plaintiff was entitled to disability benefits under the second, alternative test for determining entitlement to disability benefits applying the express and unambiguous language of the policy, this Court concludes that MetLife acted arbitrarily and capriciously in denying plaintiff's claim for disability benefits, that there is no genuine issue as to any material fact, and that plaintiff is entitled to judgment as a matter of law. In its review of all materials submitted by the parties, the Court finds no challenge by defendant MetLife to plaintiff's claimed 50% loss of earnings capacity.[9] Furthermore, the Court has

---

9. There is no dispute in the record before this Court that plaintiff has suffered a 50% loss of earnings capacity. He has no earnings from his employment with XL/Datacomp, having been terminated from his position with the company due to the inability to perform his job duties in January of 1995.

**1426**

not been able to locate any genuine issue of material fact suggesting that plaintiff has not required the regular care and attendance of a doctor, within the meaning of the policy, due to injury or sickness. Without more specific allegations or references to where such factual disputes may be found in the materials now before the Court, " 'we will not search the record in an effort to determine whether there exists dormant evidence which might require submission of the case to a jury.' *Id.* at 1025; *accord, United States v. Dunkel,* 927 F.2d 955, 956 (7th Cir.1991) ("Judges are not like pigs, hunting for truffles buried in briefs."). We cannot consider these unsubstantiated allegations[.]" *Gross v. Burggraf Const. Co.,* 53 F.3d 1531, 1546 (10th Cir. 1995), quoting *Thomas v. Wichita Coca–Cola Bottling Co.,* 968 F.2d 1022, 1025 (10th Cir.), *cert. denied,* 506 U.S. 1013, 113 S.Ct. 635, 121 L.Ed.2d 566 (1992).

Accordingly, and for the foregoing reasons, it is therefore

**ORDERED** that defendant Metropolitan Life Insurance Company's Motion for Summary Judgment shall be, and is, **DENIED.** It is further

**ORDERED** that plaintiff Sam Lindsey's Motion for Summary Judgment shall be, and is, **GRANTED.** It is further

**ORDERED** that defendant Metropolitan Life Insurance Company shall award plaintiff monthly disability benefits retroactive to January 27, 1994, plus interest at the statutory rate, and reasonable attorney's fees and costs of this action pursuant to 29 U.S.C. § 1132(g)(1).